UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BEHROUZ SHOKRI,<br><br>        Plaintiff,<br><br>    v.<br><br>THE BOEING COMPANY, a Delaware corporation,<br><br>        Defendant. | Case No. C16-1132 RSM<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I.    INTRODUCTION

This matter comes before the Court on Defendant's Motion for Summary Judgment on all of Plaintiff's claims. Dkt. #96. Plaintiff has alleged, under 42 U.S.C. § 1981 ("§ 1981") and the Washington Law against Discrimination ("WLAD"), that Defendant discriminated and retaliated against him on account of his race and national origin. Dkt. #1 ¶ 2. Defendant argues that Plaintiff's evidence cannot support a prima facie case of discrimination or retaliation and, in any event, cannot show that Defendant did not have legitimate business reasons for its actions or that Defendant's reasons were merely a pretext for discrimination or retaliation. Dkt. #96 at 2–3. Plaintiff argues that he has "provided substantial evidence in support of his case and has disputed the material facts." Dkt. #122-1 at 1.[1] While Plaintiff has requested oral argument, the

---

[1] Plaintiff filed a timely response to Defendant's Motion for Summary Judgment and most of his supporting documents on January 29, 2018. Dkts. ##106–113. Several others of Plaintiff's

ORDER – 1

Court finds oral argument unnecessary to its resolution of Defendant's motion. Having considered the parties' briefing and the relevant record, and for the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment.

## II.    BACKGROUND

Plaintiff Behrouz Shokri is originally from Iran and is of Persian and Middle Eastern race. Dkt. #122-2 at ¶ 3. Plaintiff was employed by Defendant, The Boeing Company, from February, 1986, until he was laid off as a part of a reduction in force in April, 2015. Dkt. #1 at ¶¶ 11, 18. At all relevant times, Plaintiff was a Systems and Data Analyst 4 (a "BAMA-4") working within Defendant's "ENOVIA" development team, a part of its IT group. Dkt. #122-2 at ¶¶ 10–12; Dkt. #99 at ¶¶ 2–3

### A. Following Management Changes, Mr. Garrity Becomes Plaintiff's New Manager

During 2014, Defendant reorganized its IT group, resulting in several management changes for Plaintiff. Dkt. #99 at ¶¶ 4–5. Plaintiff began the year under the management of Mr. McClees who had previously managed Plaintiff for several years and who continued to manage Plaintiff and the ENOVIA team until April, 2014. *Id.* Management of the team was then transferred to Mr. Nelson from April to August because Defendant initially intended to maintain the ENOVIA team in Washington. *Id.* Defendant later decided to move its ENOVIA team to South Carolina and placed the team under the management of Mr. Garrity, who was located in South Carolina. *Id.* Mr. Garrity was Plaintiff's manager from August until his termination on April 24, 2015. *Id.*

---

supporting documents were filed in the early minutes of January 30, 2018. Dkts. ##114–121. Subsequently, Plaintiff filed a Praecipe, indicating that several drafting errors existed in Plaintiff's Response and Plaintiff's Declaration and requesting that the Court consider corrected versions attached thereto. Dkt. #122 at 1. Defendant notes that the corrections actually removed a substantive assertion. Dkt. #123 at 4 n.4. Regardless, the Court has considered Plaintiff's corrected response, corrected declaration, and late filed documents.

Plaintiff did not believe that his new manager was qualified or effective as Mr. Garrity had "only been with [Defendant] for approximately two years [and] . . . had little to no IT experience, computer science experience, or software development experience." Dkt. #122-2 at ¶ 21. Further, Plaintiff experienced a lack of direct communication with Mr. Garrity and Mr. Garrity ceased "weekly face to face status meetings." *Id.* at ¶ 22.

To foster communication, Plaintiff took the initiative to schedule a face to face meeting with Mr. Garrity when he was in Washington on October 30, 2014. *Id.* at ¶¶ 23–24. During the meeting Plaintiff discussed the status of his projects, his concerns with the performance of a contractor, and his opinion that "continuing the weekly meetings would be helpful for the team and for [Mr. Garrity]." *Id.* at ¶¶ 24–26. During the course of the meeting, Plaintiff observed "Mr. Garrity [become] visibly frustrated and hostile" and Mr. Garrity "angrily said to [Plaintiff] in a very aggressive tone: 'Where are you from?' and 'What is your nationality?'" *Id.* at ¶ 27. Plaintiff "was offended by the comment" as he felt "[i]t was not asked as any kind of pleasantry or curiosity." *Id.* at ¶ 28. In response, Plaintiff told Mr. Garrity: "This has nothing to do with this conversation. I'm Iranian, and why you're [sic] asking about my nationality?" Dkt. #97-1 at 17–18. Mr. Garrity responded: "What else do you have to complain about?" *Id.* After Plaintiff responded that he had nothing else, Mr. Garrity "stormed out of the conference room, abruptly terminating the meeting." Dkt. #122-2 at ¶¶ 30–31.

**B. Plaintiff's 2014 Performance Management Review**

Within Defendant's IT group, managers complete yearly Performance Management Reviews ("PMs") for their hourly employees based on their individual performance. Dkt. #99 at ¶¶ 6, 8. Managers assign values on a variety of metrics within the areas of "Business Goals and Objectives" ("B&Os") and "Performance Values" ("PVs") using the following scale: "1 Does

Not Meet," "2 Met Some Expectations," "3 Met Expectations," "4 Exceeds Expectations," and "5 Far Exceeds Expectations.." *Id.* at ¶ 6. Even though the PMs consider individual performance, there was a push, in mid-to-late 2014, for managers to force differentiation and have tough conversations in the review process by more closely applying rating criteria and utilizing the full rating scale. Dkt. #97-4 at 3–4; Dkt. #98 at ¶ 5; Dkt. #99 at ¶ 7.

Central to his claims, Plaintiff alleges that under Mr. Garrity he received "some of the worst and most unfair Performance Management and Job-Related Competencies evaluations he had received in his 29 years with [Defendant], despite 2014 being one of the most successful years of his career." Dkt. #1 at ¶ 16. Mr. Garrity, as Plaintiff's manager at the end of 2014, completed his PM for the year in November, 2014. Dkt. #122-2 at ¶ 43. Mr. Garrity gave Plaintiff an overall rating of "(3) 'Met Expectations'" in the B&Os section and gave Plaintiff a mixture of "3"s and "4"s within the individual metrics of that section. Dkt. #107-1 at 255–65. In the PVs section, Mr. Garrity gave Plaintiff "3"s on the individual metrics as well as an overall rating of "(3) 'Met Expectations.'" *Id.* Mr. Garrity explained in the 2014 PM that Plaintiff's "transition from 'exceeds' to 'mets' [sic] was not due to a decline in his performance, but due to [Mr. Garrity] working to provide more accurate feedback and metrics for the requirements that [Plaintiff] has in his position and level." Dkt. #107-1 at 260.

Mr. Garrity's ratings were a departure from Plaintiff's 2013 PM, completed by Mr. McClees, and his mid-year 2014 PM, completed by Mr. Nelson, each of which rated Plaintiff "(4) 'Exceeds Expectations'" in both the B&Os and PVs. Dkt. #107-1 at 235–53. Further, the lower ranking was despite Plaintiff having successfully completed several projects in 2014, pleasing his internal customers and saving Defendant over 10 million dollars. Dkt. #122-1 at 2–3; Dkt. #122-2 at ¶¶ 38–40. Mr. Garrity knew of at least one of these successful projects before

rating Plaintiff and considered those accomplishments in Plaintiff's 2014 PM ratings, rating him as exceeding expectations in relevant subcategories. Dkt. #109; Dkt. #98 at ¶ 16. While significant, the accomplishments were not unexpected for an employee of Plaintiff's level. Dkt. #98 at ¶ 15; Dkt. #99 at ¶ 19.

On December 8, 2014, Plaintiff began an alternative dispute resolution process ("ADR") "challenging the fairness, process, and scoring" of his 2014 PM ratings. Dkt. #122-2 at ¶¶ 62–63. Specifically, Plaintiff argued that the PM rating did not "fairly reflect my actual performance, contributions, and accomplishments made during the year." Dkt. #97-7 at 2. During a January 5, 2015 phone call, Mr. Garrity ordered Plaintiff to sign his 2014 PM rating and Plaintiff told Mr. Garrity that "the way you graded me is discriminatory and biased, and I have to—I'm challenging you, and taking this to ADR." Dkt. #122-2 at ¶ 71–73. On the same date, Plaintiff signed his 2014 PM ratings and included a narrative disagreeing with the ratings but not indicating that he believed the review was discriminatory, motivated by racial animus, or retaliatory. Dkt. #107-1 at 263–65.

The ADR process was supposed to have three steps. Plaintiff's ADR appeal proceeded through the first two steps, but Mr. Garrity—Defendant's representative—did not agree to change Plaintiff's ratings. Dkt. #107-3 at 38; Dkt. #107-1 at 53–61. The ADR process was terminated prior to the final step—a more involved Panel Review to determine whether the ratings were in line with Defendant's policies. Dkt. #107-1 at 56–59. Scheduling difficulties did not allow the Panel Review to occur before Plaintiff's employment was terminated. *Id.*

## C. Defendant's 2015 Reduction in Force and Termination of Plaintiff's Employment

In early 2015, Defendant's IT group commenced a reduction in force ("RIF") in Puget Sound, including a RIF for employees within Plaintiff's job classification—BAMA-4. Dkt. #99

at ¶ 9.  The IT group had gone through several reductions in force in the preceding years, leaving a pool of talented employees.  *Id.*  For its 2015 RIF, Defendant followed a set process.  *Id.* at ¶ 10; Dkt. #99-1.  A "Skill Captain" was first designated for BAMA-4s and the Skill Captain worked with managers of BAMA-4s to identify agreed upon job competencies.  Dkt. #99 at ¶ 11.  The Skill Captain and managers then assigned the job competencies weighted values to comprise 60% of the RIF assessment score and the 2014 PM scores made up the other 40% of the assessment score (20% B&Os, 20% PVs).  *Id.*  Managers rated their individual BAMA-4s on the agreed job competencies, using a scale of 1 (Entry Level) to 5 (Expert).  *Id.* at ¶ 12.  After rating their employees, managers met collectively with the Skill Captain to generate an overall ranking, with the ability to modify ratings based on feedback and input amongst themselves and with approval of the group.  *Id.* at ¶ 15.  During the manager's meeting, one of Plaintiff's ratings "was changed from a 3 to a 2 based on management consensus."  Dkt. #98-4 at 3.  During the same meeting, four other employees had their scores in individual competencies adjusted by one point—two were adjusted down by a point and two were adjusted up by a point.  *Id.*

Upon finalization of the assessment, Plaintiff was rated 22nd out of 24 BAMA-4s working within the Puget Sound region and was ultimately selected for involuntary layoff.  *Id.* at ¶ 16.  Plaintiff was given a "60 Day Advanced Notification of Layoff" on or about February 17, 2015, confirming that his last day of employment would be April 24, 2015.  Dkt. #98 at ¶ 12; Dkt. #98-5 at 3.

**D. Plaintiff's Relationship with Mr. Garrity Did Not Improve**

During their time working together, the relationship between Plaintiff and Mr. Garrity did not improve.  Mr. Garrity did not submit a "Lean+ plate" detailing Plaintiff's accomplishments on a specific project, which may have entitled Plaintiff to a monetary award.  Dkt. #122-2 at

¶¶ 36–39.  Plaintiff's understanding was that managers were to submit the necessary supporting documentation.  *Id.*  Further, Mr. Garrity gave Plaintiff a disappointing raise in 2015.  Defendant uses Independent Performance Assessment ("IPA") ratings in part to determine raises.  *Id.* at ¶ 59.  Mr. Garrity gave Plaintiff a lower IPA rating and ultimately a smaller raise than he had received in previous years.  *Id.* at ¶ 58–60; Dkt. #107-2 at 11–15.  Upon learning that he would be terminated, Plaintiff received assistance from others to find possible job openings, but Mr. Garrity did not assist him.  Dkt. #122-2 at ¶ 86.  Rather, Mr. Garrity treated Plaintiff in a hostile manner and advocated against Plaintiff's importance to the company and against giving Plaintiff an extension *Id.* at ¶ 87; Dkt. #107-2 at 59–76.

**E. Plaintiff's Internal Appeals**

After learning that he was to be terminated, Plaintiff attempted to alter his course and elevate his concerns about possible discrimination.  On February 24, 2015, Plaintiff made a complaint of discrimination to Defendant's Western Equal Employment Office ("EEO").  Dkt. #107-3 at 42–45.  Specifically, Plaintiff complained that at the October 30, 2014 meeting with Mr. Garrity, "he asked me what my nationality was, which was irrelevant to the subject and the meeting."  Defendant's EEO did not investigate and rejected the claim.  Dkt. #107-3 at 47–48.

On March 2, 2015, Plaintiff began a RIF Appeal process, arguing that his job competency evaluations were unfair and his job code was incorrect—meaning that he was compared to the wrong employees.  Dkt. #122-2 at ¶ 80 Dkt. #107-2 at 82.  Defendant held a RIF appeal meeting on April 14, 2015.  Dkt. #107-2 at 98.  But Mr. Garrity refused to alter Plaintiff's RIF scores and on April 16, 2015, Plaintiff was informed that his RIF Appeal was denied and that he would still be terminated.  Dkt. #122-2 at ¶ 81; Dkt. #107-2 at 98–100.

Around April 11, 2015, Plaintiff submitted a complaint to Defendant's Ethics Department alleging that Mr. Garrity was discriminating against him based upon his nationality and retaliating against him as well. Dkt. #122-2 at ¶ 88. Dkt. #107-3 at 58–68. The Ethics Department did some preliminary investigation, but ultimately declined to investigate because the allegation was "Discrimination EEO" and "Retaliation (Non-EEO)." Dkt. #107-3 at 58. The matter was referred to Defendant's Eastern EEO, where it was sent back to Defendant's Western EEO, and ultimately denied. Dkt. #122-2 at ¶¶ 89–91.

On April 24, 2015, Defendant terminated Plaintiff's employment.

## III. DISCUSSION

### A. Standard of Review for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

The non-moving party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 251. Neither will uncorroborated allegations

and self-serving testimony create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987). Rather, the non-moving party must make a "sufficient showing on [each] essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

On summary judgment, the Court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). However, where the non-moving party fails to properly support an assertion of fact or fails to properly address the moving party's assertions of fact, the Court will accept the fact as undisputed. Fed. R. Civ. P. 56(e). As such, the Court relies "on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1278–79 (9th Cir. 1996) (quotation marks and citations omitted). The Court need not "comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *Keenan*, 91 F.3d at 1279 (the court will not "scour the record in search of a genuine issue of triable fact").[2]

---

[2] Plaintiff's briefing has left the Court to scour the record, unaided. Plaintiff completely fails to adequately cite to the record, with the exception of deposition testimony. Local Rule 10(e)(6) provides that "the parties shall, insofar as possible, cite the page and line of any part of the transcript or record to which their pleadings, motions or other filings refer." LCR10(e)(6). Throughout, Plaintiff's response cites broadly to multi-page exhibits and multi-paragraph declarations—including Plaintiff's own 13 page, nearly 100 paragraph declaration. Plaintiff provides the court no assistance on locating the specific facts upon which he relies. The issue is exacerbated by Plaintiff's generous reading of the record. The Court has nevertheless extensively and carefully reviewed the record in concluding that the record as a whole does not present specific triable issues of fact sufficient to defeat summary judgment.

### B. Section 1981 and WLAD Discrimination Claims

Plaintiff's first and third claims for relief allege discrimination on account of "race, color, national origin, ethnicity, and/or accent" in violation of § 1981 and the WLAD. Dkt. #1 at ¶¶ 31, 33. Section 1981 bars racial discrimination in the making and enforcement of contracts. *Runyon v. McCrary,* 427 U.S. 160, 168 (1976). The WLAD similarly bars discharge or discrimination in the terms or conditions of employment on account of race or national origin. RCW 49.60.180.

Because there will rarely be direct evidence of discrimination, discrimination claims are often considered under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973). *See Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate,* 470 F.3d 827, 837–38 (9th Cir. 2006) (affirming that Title VII substantive standards apply to a § 1981 claim); *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 189 Wash.2d 516, 404 P.3d 464, 470–71 (2017) (applying *McDonnell Douglas* framework to claims under the WLAD). Because Washington Courts look to federal law in interpreting the WLAD, *see id.*, the Court will consider this motion under federal law, considering Washington case law where appropriate.

Under *McDonnell Douglas*, a plaintiff bears the initial burden of establishing a prima facie case by raising an inference of discrimination—a "presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981). After this prima facie case is made, the burden "then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1005 (9th Cir. 1985), *as amended*, 784 F.2d 1407 (1986)). If the defendant succeeds, then to defeat summary judgment, the plaintiff must demonstrate that the "articulated reason is a pretext for unlawful discrimination by 'either directly persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Aragon v. Republic Silver State Disposal, Ind.*, 292 F.3d 654, 658–9 (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quotation marks and string citation omitted). "Although intermediate burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253).

### 1. Plaintiff's Prima Facie Case

An inference of discrimination may be established "in whatever manner is appropriate in the particular circumstances." *Diaz v. Am. Telephone & Telegraph*, 752 F.2d 1356, 1361 (9th Cir. 1985). "The requisite degree of proof necessary to establish a prima facie case for [§ 1981] claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis*, 26 F.3d at 889 (citing *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir. 1987), *cert. denied,* 498 U.S. 939 (1990)). In disparate treatment cases, the inference is often established by the plaintiff showing that: (1) he is a member of a protected class, (2) he was qualified for his position, (3) he was subject to an adverse employment action, and (4) similarly situated employees outside the protected class were treated more favorably. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). The parties appear to agree that consideration of the disparate treatment test is appropriate here.[3]

---

[3] Plaintiff also argues that three facts independently raise an inference of discrimination: (1) because his 2014 PM was lower than his 2013 PM; (2) because of Mr. Garrity's Oct. 30 questions; and (3) because he was "replaced" by white employees. Dkt. #122-1 at 18–21. Because these arguments are not overly persuasive on their own and because the Court otherwise finds that Plaintiff has established a prima facie case, the Court will more thoroughly address these arguments with regard to pretext.

The parties agree that Plaintiff has satisfied the first two elements with regard to all of his claims as Plaintiff is a member of a protected class and was qualified for his position. Also, the parties appear to agree that Plaintiff suffered two adverse employment actions: (1) decreased 2014 PM ratings and (2) being terminated in a 2015 RIF.[4] Therefore, the main focus is on whether Plaintiff was treated less favorably than other similarly situated employees outside of his protected class.

Disparate treatment of similarly situated employees is generally relevant at both the first and third stages of the *McDonnell Douglas* framework. *See Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010). But due to the minimal burden at the first stage, the consideration is often most appropriate at the third stage. *Id.* There are significant weaknesses with Plaintiff's arguments that similarly situated individuals outside of his protected class were treated more favorably in the 2014 PM ratings and the 2015 RIF, as discussed below. But, the record does support that some individuals outside of Plaintiff's protected class received the same or better ratings on their 2014 PMs and that some individuals outside of Plaintiff's protected class were retained after the 2015 RIF. Because Plaintiff's burden is minimal, the Court finds that Plaintiff established an inference of unlawful discrimination.

---

[4] Plaintiff's Complaint alleges that he suffered adverse employment actions when: (1) he was given negative performance evaluations, (2) he was denied a cash award, (3) he was not promoted, (4) he was not given more than a 2% raise, (5) his job classification was not corrected, and (6) he was given negative job competency evaluations, ultimately leading to him being laid off in the 2015 RIF. Dkt. #1 at ¶ 18. However, many of these would fail to establish a prima facie case because they are not sufficiently adverse or because Plaintiff cannot establish that similarly situated individuals received more favorable treatment. Because Plaintiff appears to abandon treating each as a basis for a prima facie case, and instead treats the totality as establishing an inference of discrimination or pretext, the Court will do the same. Dkt. #122-1 at 17.

ORDER – 12

## 2. Defendant Had Legitimate Business Reasons for Its Actions

The record clearly establishes that Defendant had legitimate business reasons for Plaintiff's 2014 PM ratings and the 2015 RIF ratings and termination. While Plaintiff takes issue with the processes and outcomes, Plaintiff does not contest the facts supporting Defendant's reasons.

Defendant has offered two uncontested, non-discriminatory reasons for Plaintiff's decreased 2014 PM rating. First, Defendant proves that IT managers were encouraged, in mid-to-late 2014, to force differentiation by closely applying the rating criteria and utilizing the full rating scale. Dkt. #97-4 at 3–4; Dkt. #98 at ¶ 5; Dkt. #99 at ¶ 7. Second, Defendant proves that Mr. Garrity gave many of the individuals he managed and rated lower ratings than they had received in 2013 under the previous manager, Mr. McClees. Dkt. #97-8 at 2.

Defendant similarly offers several legitimate reasons for Plaintiff's termination in the 2015 reduction in force. First, Defendant had conducted several reductions in force in the preceding years, leaving a pool of talented employees. Dkt. #99 at ¶ 9. Plaintiff was ultimately ranked 22nd out of 24 BAMA-4s working within the Puget Sound region and was terminated on that basis. *Id.* at ¶ 16. Second, Plaintiff was one of eight BAMA-4s who were identified as "at risk" and Mr. Garrity managed four of them. *Id.*; Dkt. #98-4; Dkt. #98 at ¶ 11. All told, ten BAMA-4s separated from employment as a result of the 2015 RIF, a reduction of approximately 42% within the job classification. Dkt. #99 at ¶ 17.[5]

Further, Mr. Garrity testifies that his "assessments of [Plaintiff's] performance, both in his 2014 PM review and as part of the 2015 RIF assessment exercise, were based strictly on my

---

[5] Outside of those identified as "at risk," two of 24 BAMA-4s evaluated within the Puget Sound region accepted voluntary layoff. Dkt. #99 at ¶ 17.

honest and good-faith assessment of his professional competency, skills, and abilities." Dkt. #98 at ¶ 21.

### 3.    Defendant's Reasons Are Not a Pretext for Unlawful Discrimination

Plaintiff's burden is to present evidence establishing that those reasons are merely a pretext masking intentional discrimination.   Pretext can be established by showing "that a discriminatory reason more likely motivated the employer" or "that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S.at 256.  A plaintiff may rely on direct evidence which proves discriminatory animus on its own—typically clearly discriminatory statements or actions—or circumstantial evidence which "requires an additional inferential step to demonstrate discrimination." *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005).  "'[V]ery little' direct evidence of [a] discriminatory motive is sufficient." *Winarto v. Toshiba America Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001).  But where circumstantial evidence is used, "a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (citations omitted).

Plaintiff has not presented sufficient evidence—direct or circumstantial—to demonstrate a genuine dispute as to pretext.  Plaintiff has no direct evidence of a discriminatory motivation. And, taken as a whole, Plaintiff's circumstantial evidence would not allow a reasonable jury to find that Defendant's otherwise legitimate business reasons were merely a pretext for intentional discrimination.

#### a.    Mr. Garrity's October 30 Questions

Plaintiff's primary argument is that Mr. Garrity demonstrated discriminatory animus during his October 30, 2014 meeting with Plaintiff.  During that interaction, Mr. Garrity angrily

asked: "Where are you from?" and "What is your nationality?"  Plaintiff does not complain of any other discriminatory interaction while employed by Defendant.  But these questions on their own do not demonstrate any animus and do not give rise to an inference that Mr. Garrity intentionally discriminated against Plaintiff.  Only the circumstances in which the questions were asked can give rise to an inference of discriminatory animus.

Plaintiff and Mr. Garrity were engaged in a heated meeting—their first—and Plaintiff testifies that he "raised concerns about the status of some projects . . . [and] disagree[d] with Mr. Garrity's decision to end weekly status update meetings" which Plaintiff believed evidenced Mr. Garrity's lack of competence.  Dkt. #122-2 at ¶¶ 26–27; Dkt. #122-1 at 4–5.  As Plaintiff criticized Mr. Garrity's management of his new group, Mr. Garrity became "visibly frustrated and hostile" and posed the questions with an angry and aggressive tone.  Dkt. #122-2 at ¶ 27.  From these circumstances a reasonable jury may infer that Mr. Garrity believed Plaintiff was not from America and/or was not ethnically Caucasian and thereby may infer that Mr. Garrity believed that inquiring into Plaintiff's nationality would demean or embarrass Plaintiff and in some manner aid him in a heated encounter.

Plaintiff argues that this gives rise to an inference of discrimination that on its own precludes summary judgment.  Dkt. #122-1 at 20.  For support Plaintiff relies on *Scrivener v. Clark College*.  181 Wash.2d 439, 334 P.3d 541 (2014).  While the case only applies to Plaintiff's WLAD claims, the case also does not support Plaintiff's argument that a so called "stray remark" about an employee's protected characteristic precludes summary judgment.  While the court in *Scrivener* did reject a categorical exclusion of all "stray remarks," it did not consider whether the stray remarks in that case could establish pretext on their own.  Rather, the court found that the stray remarks were relevant evidence that, when combined with all of Ms. Scrivener's other

evidence, would allow a reasonable jury to conclude that the decision to not hire her was made on account of her age.

But Plaintiff's reliance on *Scrivener* fails because the plaintiff in *Scrivener* had much stronger evidence supporting an inference that the employer's reasons were a pretext for intentional discrimination. First, neither of the younger applicants that were hired over Ms. Scrivener satisfied all of the desired qualifications and requirements for the position—Ms. Scrivener did. *Id.* at 547. Second, the college president—who made the hiring decision— expressed a desire to hire younger applicants and indicated that there was a "'glaring need' for younger talent." *Id.* at 547–48. Third, the president directly mocked Ms. Scrivener with a "younger reference" and indicated he wanted candidates displaying "youthfulness." *Id.* at 545, 548. The statements in *Scrivener* were directly indicative of a discriminatory animus toward Ms. Scrivener's protected class and were statements from which the jury could directly infer intent to discriminate against older applicants by not hiring them. Here, there is only one statement at issue and a reasonable jury could only infer racial animus by first using the surrounding circumstances to infer Mr. Garrity's state of mind and intent.

However, Defendant's argument that the questions are "stray remarks" and legally insufficient to even create an inference of discrimination is also not correct and the cases cited by Defendant are distinguishable. Dkt. #96 at 13 (citing cases finding that "stray remarks" did not evidence discriminatory intent). Courts do indeed discount "stray remarks" that are not connected to the adverse action and made in an ambivalent manner. *See id.* But that was not the case here. Defendant has not pointed to any cases where otherwise innocuous remarks uttered in an angry manner during the course of a dispute were considered irrelevant stray remarks.

Mr. Garrity's questions are not irrelevant but they also do not prove "discriminatory animus against [Plaintiff] for being from Iran, and Middle Eastern" as Plaintiff argues. Dkt. #122-1 at 21. Rather, the questions—and more importantly the context in which they were posed—are slight evidence from which a reasonable jury could ultimately infer that Mr. Garrity harbors animus toward all non-American, non-European Caucasians. As a whole, this is slight evidence—a scintilla—to satisfy Plaintiff's burden of presenting specific and substantial evidence that Defendant intentionally discriminated against him on account of his race or national origin.

Plaintiff asserts that "this is not the only evidence that [Mr.] Garrity harbored discriminatory intent toward [Plaintiff] because of his nationality." Dkt. #122-1 at 20. In support Plaintiff cites to Plaintiff's almost 100 paragraph declaration and seven pages of Plaintiff's deposition testimony. *Id.* But the Court declines to scour the record and make Plaintiff's case for him. Plaintiff does not point to any other evidence that arguably establishes a racially discriminatory motive drove the otherwise legitimate business decisions. Plaintiff, therefore, must attempt to show pretext by demonstrating that Defendant's legitimate business reasons are not credible.

### b. 2014 PM Rating

Plaintiff argues, without citing the record, that his 2014 PM ratings were discriminatory. Dkt. #122-1 at 19. To show that the ratings were a pretext, Plaintiff argues that he performed well in 2014, his internal customers were very happy, others had previously given him better ratings, and a jury could infer that Mr. Garrity had no basis for giving him a lower rating.

To support his 2014 performance, Plaintiff points to successful projects resulting in significant savings of over 10 million dollars for Defendant. Dkt. #122-1 at 19. While Plaintiff

contends—without any evidence—that nobody "did as much to save [Defendant] money in 2014 and 2015," Defendant has established that those cost savings were not unexpected for an employee of Plaintiff's level. Dkt. #98 at ¶ 15–17; Dkt. #99 at ¶ 19. Regardless, an employee's subjective belief about his performance is not relevant and does not alone raise an issue of material fact. *Aragon*, 292 F.3d at 660; *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).

Assessments by Plaintiff's co-workers can "critically undermine the credibility of [an] official evaluation in a manner relevant to determining the existence of pretext." *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1051 (9th Cir. 2009). Here, Plaintiff establishes that his satisfied internal customers—Ms. Maisonet and Mr. Wilmore—would have provided him higher P&V ratings than Mr. Garrity did and that this information was provided to Mr. Garrity. Dkt. #107-1 at 267–73. But while the subjective impressions of internal customers working with Plaintiff on specific projects may be probative, they do not establish that Plaintiff's manager's overall performance rating of Plaintiff, as a BAMA-4 within the ENOVIA team, was a pretext. Plaintiff simply has not shown that his internal customers were in a position to know all of Plaintiff's responsibilities or how he compared to others in his job classification or within his team.

Plaintiff also believes that his prior managers—Mr. McClees and Mr. Nelson—reviewed him more fairly and that at least Mr. McClees would have provided him a higher 2014 PM rating. Plaintiff bases this off of Mr. McClees's testimony that, from a position outside the ENOVIA team, he believed Plaintiff's performance in 2014 was equivalent to his prior performance. Dkt. #107-1 at 116–17. That Mr. McClees's subjective rating of Plaintiff stayed the same does not indicate that Mr. Garrity's subjective ratings, as Plaintiff's new manager, were pretextual. Plaintiff also relies on the positive ratings given him by Mr. Nelson in the mid-year 2014 PM.

But, at least with regard to the B&O section, Mr. Nelson scored Plaintiff similarly to Mr. Garrity.[6] More importantly, Mr. Nelson "continues to believe that Mr. Garrity's ratings of Plaintiff were fair and reasonable." Dkt. #99 at ¶ 18.

That Plaintiff received lower ratings in his 2014 PM review than those in 2013 does not establish that the ratings were pretextual. Decreased performance reviews can certainly be probative of pretext. *Yartzoff*, 809 F.2d 1371; *Winarto*, 274 F.3d 1276. But they are probative when there are unexplained drops in performance reviews. For example, in *Winarto*, the same supervisor had given the plaintiff positive ratings prior to the plaintiff making protected complaints and thereafter rated the plaintiff unjustifiably low. *Winarto*, 274 F.3d at 1287–86. Conversely, in *Steiner v. Showboat Operating Co.*, the Ninth Circuit held that low performance reviews given by a new management team did not establish retaliation. 25 F.3d 1459 (9th Cir. 1994). This case is similar to *Steiner*. Mr. Garrity was Plaintiff's new manager and had not reviewed his work previously. Regardless of whether he was qualified to do so, he was tasked with managing the ENOVIA team and reviewing Plaintiff's work as well as the work of other BAMA-4s and employees on the team. That Mr. Garrity valued Plaintiff's contributions differently or had different ideas about what measures were important to the success of the ENOVIA team does not establish that the reviews were a pretext.[7]

---

[6] Mr. Nelson gave Plaintiff seven "4"s and thirteen "3"s. Dkt. #107-1 at 245–53. Mr. Garrity gave Plaintiff six "4"s and fourteen "3"s. Dkt. #107-1 at 255–65.

[7] The Court notes, lastly, that Plaintiff appears to argue that the 2014 PMs were discriminatory because they put him at risk of layoff in the 2015 RIF. But Plaintiff does not support that assertion with evidence. In fact, Plaintiff does not show that Mr. Garrity was aware of the impending RIF at the time that he made the 2014 PM evaluation of Plaintiff. Plaintiff states he learned about the RIF in "late 2014" but does not specify when. Dkt. #122-2 at ¶ 41. This is not enough to support an inference that Mr. Garrity knew a low 2014 PM rating would put Plaintiff at risk. Further, Mr. Garrity had no way to know the ratings that other managers were giving their BAMA-4s. In the RIF, Plaintiff was considered against all BAMA-4s, whether rated by Mr. Garrity or not. Plaintiff's ratings certainly are not low enough that a reasonable jury could

### c. 2015 RIF

Plaintiff also fails to show that his 2015 RIF ratings were a pretext for intentional discrimination. Plaintiff argues that he has presented evidence showing that Mr. Garrity manipulated the process by intentionally rating Plaintiff poorly while intentionally rating a white employee artificially high. Dkt. #122-1 at 22. But Plaintiff's arguments do not have adequate factual support and do not establish pretext.

Plaintiff first argues that Mr. Garrity demonstrated a willingness to "work down" Plaintiff's RIF ratings, showing that the ratings were a pretext. Dkt. #122-1 at 22. Specifically, Plaintiff points to a January 27, 2015, exchange between Mr. Garrity and Ms. McCuen in which Mr. Garrity indicates: "remember, I was one of 3 votes and I worked the numbers down greatly from what [Mr. McClees] and [Mr. Nelson] had. [I]f I were the only voting member, it would have been lower." Dkt. #107-2 at 6–7. But this does not support an inference that Mr. Garrity was manipulating the numbers in order to discriminate. Rather, it supports an inference that different people had different views on the proper scoring of Plaintiff. That Mr. Garrity's judgment differed from Mr. McClees and Mr. Nelson does not show that Mr. Garrity's ratings were a pretext. Further, nowhere does Plaintiff establish what ratings Mr. McClees or Mr. Nelson would have actually assigned or whether those ratings would have been higher than those assigned by Mr. Garrity.

Plaintiff further argues that Mr. Garrity expressed willingness to manipulate the RIF ratings of Mr. Hendry—a white Programmer Analyst 4 ("BAMB-4"). Dkt. #122-1 at 22. But again this does not establish that Plaintiff's RIF ratings were manipulated or pretextual. First, Plaintiff does not present any evidence showing that this was done on account of Mr. Hendry's

---

infer that Mr. Garrity assured Plaintiff would be comparably lower than the other BAMA-4s, especially when Mr. Garrity gave other BAMA-4s lower 2014 PM ratings. Dkt. #97-8 at 2.

race or national origin or that it had any effect on Plaintiff as Mr. Hendry was considered, if at all, in the BAMB RIF.[8]  Nor does Plaintiff present any evidence contesting Defendant's innocuous explanation that while Mr. Hendry was technically listed in the BAMB node for the RIF, he had been exempted from the process by Defendant because he elected to take a position in South Carolina.  Dkt. #107-1 at 36–39.  Plaintiff's argument grievously misrepresents the record.

Lastly, Plaintiff alleges that Mr. Garrity was unqualified to assess Plaintiff in the 2015 RIF and gave ratings that were objectively unsupported.  Dkt. #122-1 at 22.  In support, Plaintiff cites to portions of the record showing that Ms. Maisonet was concerned about the impact Plaintiff's termination would have on her team's project.  Dkt. #107-2 at 72–80; Dkt. #107-3 at 1–4.  But the record shows the Ms. Maisonet was concerned about losing Plaintiff's historical knowledge of the project, not that she believed the ratings were a pretext for discrimination.  In fact, as early as April 30, 2014,—well before Mr. Garrity became Plaintiff's manager and well before any indication that Plaintiff may be laid off—Ms. Maisonet expressed concern over losing any of the IT employees working with her team due to reorganization of the IT group.  Dkt. #107-1 at 278.

### d.  Similarly Situated Employees

Pretext is often at least partially established by showing that the plaintiff was treated differently than similarly situated employees.  *Vasquez*, 349 F.3d at 641.  But here, Plaintiff is unable to demonstrate that similarly situated employees outside of his protected class were treated more favorably.

---

[8]  Indeed, Defendant establishes that Mr. Hendry was ultimately not considered in the RIF "because he elected to transfer to Charleston, South Carolina, and thus was exempt from the Puget Sound RIF."  Dkt. #125 at ¶ 5.

Plaintiff argues that the other employees within his job classification (BAMA-4) were not similarly situated comparators. Rather, Plaintiff argues that a proper class of comparators consists of "Subject Matter Experts" ("SMEs"), a group of employees doing "equivalent work" and with "equivalent experience and skills." Dkt. #122-1 at 19.[9] But Plaintiff must establish that comparators are similarly situated in "all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (2006). Notably, all of these SMEs, except for Plaintiff (a BAMA-4), were classified as BAMB-4s at the relevant time.[10] Dkts. #113, 114, 115.

Plaintiff asserts that he was doing 70% programming, work "characteristically" performed by BAMB-4s. Dkt. #122-1 at 11. But other than including job descriptions, Plaintiff does not show the differences between the two positions, that he was performing other BAMB-4 functions, or that other BAMA-4s were not similarly performing "programming." Dkt. #122-1 at 11–12. Indeed, a portion of the record cited by Plaintiff also establishes that Mr. Johnson, another BAMA-4 who was terminated, was also a "programmer" yet Plaintiff does not include him as a comparator. Dkt. #107-1 at 80–82.

Further diminishing Plaintiff's argument that his similarly situated comparators were the SMEs, Plaintiff cites to no part of the record that supports SME as a designation within or used by Defendant's IT group. Construing the record in Plaintiff's favor, as the Court must, SME is an informal designation utilized by an internal customer of Plaintiff's IT team. Plaintiff relies

---

[9] Plaintiff alters his group of comparators with regard to the SME classification and pay raises. Dkt. #122-1 at 8, 19. Plaintiff relies upon Mr. Crum to show that Plaintiff received a lower raise, but does not include Mr. Crum in his group of SME comparators, even though Mr. Crum is a BAMB-4 like the others selected by Plaintiff. Dkt. #116.

[10] Plaintiff argues that he was incorrectly classified as a BAMA-4 and should have been a BAMB-4. Dkt. #122-1 at 11–12. But Plaintiff does not contend that his incorrect job classification was due to Defendant's discrimination and indeed it preceded Mr. Garrity becoming his manager. Dkt. #122-2 at ¶ 76.

primarily upon the declaration of Ms. Maisonet, an Engineering Process Manager, whose Engineering team identified IT employees assigned to work on their Engineering projects, including Plaintiff, as "Subject Matter Experts." Dkt. #107-1 at 3–4, at ¶¶ 4–9.  Ms. Maisonet's team considered SMEs to be "team members who are critical to achieving program goals and ensuring a high-quality product is delivered on time." *Id.*  In fact, Ms. Maisonet's team appears to have considered all of the IT employees who had worked for the team and had institutional knowledge of her team's projects as SMEs.  Dkt. #107-1 at 4, at ¶ 9; Dkt. #107-1 at 278.  Curiously, while Ms. Maisonet identifies Mr. Hendry as a SME, she apparently did not consider him a SME when he replaced Plaintiff on a specific project. *Compare* Dkt. #107-1 at 4, ¶ 9, *with* Dkt. #107-1 at 8, at ¶ 27.

Plaintiff's only support that the IT group used the SME designation internally is a citation to the deposition testimony of Mr. McClees, an IT manager, in which he agrees that several individuals identified in a document not identified in the record were listed as "experts" and that he agreed with that assessment.  Dkt. #107-1 at 125.  Even putting aside the hearsay considerations and lack of context, the testimony does not support an inference that the IT group had a designation of "Subject Matter Expert."  In fact, Plaintiff's argument to this effect mischaracterizes the record as Plaintiff himself indicated that "[t]hree of my teammates and I were recognized by the customers as SME and critical to the ENOVIA development project."  Dkt. #107-3 at 44.  Plaintiff does not provide evidence allowing a reasonable jury to infer that he and the other BAMB-4s were similarly situated in all material respects.  Therefore, the Court will consider Plaintiff similarly situated to the others within his job classification—BAMA-4.

### i. 2014 PM Ratings

Plaintiff is unable to establish that he was treated differently than other similarly situated employees outside of his protected class with regard to his 2014 PM ratings. As noted above, IT managers had been encouraged to grade harder and force differentiation. Additionally, Defendant proves, and Plaintiff does not contest, that Mr. Garrity rated four BAMA-4s who were ultimately subject to the same 2015 RIF and that two of those four were rated lower in 2014 than in 2013. Dkt. #97 at ¶ 9. Overall, Defendant proves, and Plaintiff does not contest, that "of the sixteen employees [Mr. Garrity] reviewed in 2014, [he] assigned lower scores to nine of them." Dkt. #96 at 6 (citing Dkt. #97-8 at 2).[11]

While the Court has rejected Plaintiff's SMEs as similarly situated, Plaintiff asserts, without citation, that "[a] jury could find discrimination simply because [Mr.] Garrity did not downgrade similarly situated white" SMEs and that this is "powerful circumstantial evidence of discrimination from which a jury could infer discrimination." Dkt. #122-1 at 20. Plaintiff, however, must present substantial evidence of pretext, not an inference of discrimination at the third stage. Without more, the fact that some employees outside of Plaintiff's protected class were not downgraded does not on its own show that Plaintiff's lower 2014 PM ratings were a pretext for intentional discrimination.

### ii. 2015 RIF

Plaintiff also does not establish that he was treated differently than similarly situated employees in the 2015 RIF. Defendant proves, and Plaintiff does not contest, that Mr. Garrity was the manager of four (including Plaintiff) of the BAMA-4s originally designated as "at risk"

---

[11] The Court notes that this includes non-BAMA-4 employees, and therefore is not purely similarly situated individuals, but it is nevertheless evidence that Mr. Garrity rated employees lower than they had previously been rated by Mr. McClees or Mr. Nelson.

and later separated from employment.  Dkt. #98 at ¶ 11; Dkt. #98-4.  Further, Defendant proves, and Plaintiff does not contest, that the 2015 RIF resulted in ten BAMA-4s separating from employment, a 42% reduction of the job classification. Dkt. #99 at ¶ 17.

Plaintiff attempts to differentiate himself from the two white BAMA-4s under Mr. Garrity's management that were also terminated, arguing that both were rated lower and "were not Subject Matter Experts doing equivalent work." Dkt. #122-1 at 20.  Yet Plaintiff offers no citation to the record to establish what work they were doing or for the proposition that the work was not equivalent.  *Id.*  In fact, the record shows that one was a "programmer," a designation Plaintiff seeks to establish for himself.  Dkt. #107-1 at 80.

Further, even if Plaintiff succeeded in showing that he was similarly situated to the SMEs he desires, he cannot show that he was treated differently.  All, except for Mr. Hendry, were exposed to a RIF and ranked against the other BAMB-4s.  Plaintiff speculates, with no support, that had he been considered with the BAMB-4 classification he would not have been terminated.  Dkt. #122-1 at 12, 19.  But this is purely speculation.  Plaintiff does not acknowledge that he would have been compared to a different group of employees or that the RIF job competencies for the BAMB-4 RIF were different than those of the BAMA-4 RIF and Plaintiff may have fared better or worse.  *Compare* Dkt. #118 *with* Dkt. #119.

That Plaintiff was not treated differently than other similarly situated employees is strong evidence against finding pretext.  *See Snead v. Metropolitan Property & Cas. Ins. Co,*, 237 F.3d 1080, 1094 (9th Cir. 2001) (finding that equal treatment of other similarly situated employees outside of plaintiff's protected class weighs against finding pretext).  In fact, Plaintiff points to no employees that were kept over him that were less qualified.  *See E.E.O.C*, 577 F.3d 1044 (finding question of fact as to pretext where several male employees were ranked lower in the

RIF, but none were ultimately terminated). Instead, similarly situated BAMA-4s outside of Plaintiff's protected class, and rated both higher and lower than Plaintiff, were also ultimately terminated.

### e. Lean+ Plate Submission

Plaintiff argues that finding pretext is supported by the fact that Mr. Garrity did not submit his accomplishments for recognition and a possible cash award. Dkt. #122-1 at 5. Plaintiff establishes that he sent Mr. Garrity information supporting a "Lean+ plate" submittal. Dkt. #107-1 at 283–85. Mr. Garrity, as Plaintiff's manager, had the discretion to provide Plaintiff with recognition based on the submission of a "Lean+ plate" and Mr. Garrity's supervisor believed recognition was warranted. Dkt. #107-1 at 197–202. But Plaintiff does not establish that the manager was obligated to submit the Lean+ plate or that Mr. Garrity treated any other employees differently by submitting a "Lean+ plate" on their behalf. Regardless, Plaintiff does not show why his manager not submitting him for recognition is evidence that he suffered racial or national origin discrimination in his 2014 PM ratings or his 2015 RIF termination.

### f. Insufficient Raise

Plaintiff also argues that pretext is demonstrated by the fact that Mr. Garrity gave him "one of the lowest pay raises in his career." Dkt. #122-1 at 8. Plaintiff argues that others received higher raises, including his SME subgroup (with an additional white BAMB-4 included). *Id.* But Defendant shows, and Plaintiff does not dispute, that Mr. Garrity gave smaller raises to three white BAMA-4s and only gave one BAMA-4 a raise larger than Plaintiff's. Dkt. #98 at ¶ 18. When compared with other BAMA-4s, Plaintiff cannot show that his raise was so low as to be evidence of discrimination or that it was lower than his peers outside of his protected class.

### g. Replacement Employees

Plaintiff acknowledges that he is not required to show that "white employees took over his work," but raises the point to establish pretext. Dkt. #122-1 at 23. Putting aside that Plaintiff does not cite to any case law supporting this argument or establish that his position was not actually eliminated—establishing that Defendant still needed his services—the fact is not material. That Plaintiff was laid off did not mean that his internal customers would no longer have a need for IT services. Nor is it probative that Defendant filled that need with remaining members of the ENOVIA team, other IT employees, and outside contractors who happened to be outside Plaintiff's protected class. Dkt. #107 at 5–6, at ¶¶ 24–27. The circumstances surrounding a RIF can certainly give rise to an inference of discrimination. *See Rose v. Wells Fargo & Co.*, 902 F.2d 1417 (9th Cir. 1990) (in reduction in force case, fact that older employees' job functions were not immediately replaced by younger works cut against finding pretext). But Plaintiff fails to show why this otherwise unremarkable fact indicates pretext.

### h. Plaintiff's Wife and Brother

Defendant points out that Plaintiff's wife, also from Iran and of Persian and Middle Eastern race, is employed by Defendant as a BAMA-4, was subject to the 2015 RIF, was not terminated, and does not believe that she was discriminated against. Dkt. #96 at 21. Defendant likewise points out that Plaintiff's brother, also from Iran and of Persian and Middle Eastern ethnicity, is employed by Defendant as a BAMA-3, was managed by Mr. Garrity, and does not believe that Mr. Garrity discriminated against him or gave him undeserved PM or RIF ratings. *Id.*

Plaintiff correctly argues that Plaintiff's wife and brother weren't similarly situated and that these facts do not "immunize" Defendant. *Connecticut v. Teal*, 457 U.S. 440 (1982) (racially

balanced work force does not immunize employer because every employee is protected from discrimination). But Plaintiff is not correct that the evidence is "simply irrelevant." Dkt. #122-1 at 20. Defendant may also present evidence disproving pretext. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 29 (1978) ("When an employer shows that a legitimate nondiscriminatory reason accounts for his action, he is simultaneously demonstrating that the action was not motivated by an illegitimate factor such as race."); *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 580 (1978) ("the employer must be allowed some latitude to introduce evidence which bears on his motive"). This uncontested evidence is relevant, even if only slightly, to show that the 2015 RIF was not a pretext to discriminate against Plaintiff's protected class and that Mr. Garrity did not harbor animus toward Plaintiff's protected class.

### i. Plaintiff Cannot Establish Pretext

Ultimately, Plaintiff fails to present sufficient evidence or demonstrate genuine disputes as to material facts that would allow a reasonable jury to find that Defendant's legitimate business decisions were merely a pretext to mask intentional discrimination. The record as a whole certainly shows a clash of personalities between Plaintiff and his new manager. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 471 (8th Cir. 2011) (noting that while evidence showed a personal conflict with new manager, there was no evidence of age discrimination). Likewise, the record as a whole demonstrates differing views on Plaintiff's abilities. *See Villiarimo*, 281 F.3d at 1063 ("[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.") (quotation marks and citations omitted); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.") (citation omitted). However, the Court's role is to remedy discrimination, not to "assume the

role of a 'super personnel department[], assessing the merits—or even rationality—of employers' nondiscriminatory business decisions." *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 250 (1st Cir. 1997) (citing *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991)).

### 4. Plaintiff's Discrimination Claims Fail

On this record, a reasonable jury could not conclude that Defendant intentionally discriminated against Plaintiff on the basis of his race or national origin. Plaintiff has provided no direct evidence of a discriminatory motivation and the evidence is insufficient to show that Defendant's legitimate business reasons are a pretext for intentional discrimination. At most, Plaintiff provides weak circumstantial evidence of oddities or errors. But this is not enough. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (citing *Reeves*, 530 U.S. at 146–47) ("[P]retext means a dishonest explanation, a lie rather than an oddity or an error."). Likewise, Plaintiff only establishes slight circumstantial evidence establishing that Mr. Garrity had a discriminatory motive that can be imputed to Defendant. But, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). When, as here, there is only a "weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. *Reeves*, 530 U.S. at 148 (2000).[12]

---

[12] Plaintiff's § 1981 claims may also fail because even a generous reading of the record does not support an inference of *racial* discrimination. "[N]ational origin discrimination is not within the ambit of § 1981." *Fonseca v. Sysco Food Services of Arizona*, 374 F.3d 840, 850 (9th Cir. 2004) (citing *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 798 (9th Cir. 2003)). Mr. Garrity's questions do not raise an adequate inference of discrimination on the basis of Plaintiff's national origin, much less his race or ethnic characteristics. Only in the context in which the questions were asked do they give rise to a slight inference of *national origin* discrimination.

ORDER – 29

Lastly, the Court notes that under the WLAD Plaintiff is only required to show "that a reasonable jury could find that discrimination was a *substantial factor* in the employer's adverse employment action." *Scrivener*, 334 P.3d at 544 (citing *Riehl v. Foodmaker, Inc.*, 152 Wash.2d 138, 94 P.3d. 930 (2004)) (emphasis added). However, because Plaintiff cannot demonstrate unlawful discrimination on the record, the Court does not need to consider the differences between the WLAD and § 1981.

**C. Retaliation**

Plaintiff's second and forth claims for relief allege retaliation for opposing discriminatory conduct in violation of § 1981 and the WLAD. Dkt. #1 at ¶¶ 32, 34. Retaliation claims are also considered under the burden shifting framework of *McDonnell Douglas*. *See Surrell v. Cal. Water Service Co.*, 518 F.3d 1097 (9th Cir. 2008). "Because Washington courts look to interpretations of federal law when analyzing retaliation claims," the Court examines Plaintiff's current claim under federal law. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002) (citing *Graves v. Dept. of Game*, 76 Wash. App. 705, 887 P.2d 424 (1994)).

Plaintiff has failed to adequately brief his retaliation claims. *See* Dkt. #122-1 at 23–24. While Plaintiff cites several cases establishing the general standard for retaliation claims, he does not cite to any cases to support his arguments that there was retaliation here and does not cite to the record outside of a single citation: "*See Supra.*" Dkt. #122-1 at 23. Plaintiff has done nothing to aid the Court in applying the facts to the law or in demonstrating that there is a genuine dispute as to any material fact and indeed Plaintiff's retaliation claims fail.

The record does support a prima facie case of retaliation. Plaintiff engaged in protected activity on the January 5, 2015 phone call with Mr. Garrity as Plaintiff had initiated the ADR process to oppose his 2014 PM ratings, he could reasonably believe the ratings were

discriminatory based on the October 30 confrontation with Mr. Garrity, and he told Mr. Garrity, the employer's ADR representative, that he believed the ratings were biased and discriminatory. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270 (2001). Thereafter, Plaintiff suffered adverse employment actions that would reasonably dissuade employees from engaging in protected activity when he was rated poorly in the 2015 RIF, received a low raise, and was terminated. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Further, the adverse employment actions were temporally proximate to the protected activity, establishing a causation relationship. *Breeden*, 532 U.S. at 273–4; *Poland v. Chertoff*, 494 F.3d 1174, 1180 n. 2 (9th Cir. 2007) (citation omitted) (causal element construed broadly at prima facie stage). The record therefore supports a prima facie case. *Surrell*, 518 F.3d at 1108 (prima facie case established by (1) protected activity, (2) adverse employment action, and (3) causal connection) (citation omitted).

But Plaintiff's argument does not extend beyond the prima facie stage. Plaintiff has not argued that Defendant lacked legitimate business reasons for the 2015 raise, the 2015 RIF ratings, or the subsequent termination. Likewise, Plaintiff has not argued that Defendant's stated reasons were a pretext for retaliation. Conversely, Defendant has established that it gave similar raises to similarly situated employees, honestly rated Plaintiff's job competencies in the 2015 RIF, and non-discriminatorily selected to terminate Plaintiff's employment. Plaintiff presents no evidence that Defendant's actions were actually driven by retaliatory intent. Instead, Plaintiff appears to rely on the same actions he argues establish pretext for intentional race and national origin discrimination. But the Court has already rejected those arguments as insufficient to establish pretext for Plaintiff's discrimination claims and they similarly fail with regard to his retaliation claims. Ultimately, a reasonable jury could not find in Plaintiff's favor. *See Univ. of Tex. Sw.*

*Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) (plaintiff's ultimate burden is to show that the adverse employment action would not have occurred but for the protected activity); *Allison v. Housing Authority of the City of Seattle*, 118 Wash.2d 79, 821 P.2d 34, 37 (1991) (under the WLAD, plaintiff must show that protected activity was a substantial factor in the adverse employment action).

Plaintiff's entire case, with regard to both discrimination and retaliation, is built upon inference. While Plaintiff is entitled to all reasonable inferences from the evidence, at some point, the reasonable jury cannot continue inferring without actual evidence. *See Nelson v. Pima Cmty. Coll.,* 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."); *Houchens v. Am. Home Assurance Co.,* 927 F.2d 163, 167 (4th Cir. 1991) (rejecting attempt to defeat summary judgment by "pil[ing] inferences on inferences").

## IV.    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Also pending before the Court is Plaintiff's Motion for Partial Summary Judgment. Dkt. #100. Plaintiff seeks summary judgment with regard to many of the defenses included in Defendant's Answer and to establish facts under 56(g) which are not material to Defendant's Motion for Summary Judgment. Because the Court has determined that Defendant is entitled to summary judgment, the Court denies Plaintiff's Motion for Partial Summary Judgment as moot.

## V.    CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby ORDERS:

1) Defendant's Motion for Summary Judgment (Dkt. #96) is GRANTED and all of Plaintiff's claims are dismissed in their entirety.

2) Plaintiff's Motion for Partial Summary Judgment (Dkt. #100) is DENIED.

3) This matter is now CLOSED.


DATED this 25th day of April 2018.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 33